**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

Federal Trade Commission,
State of Florida,
State of Indiana,
State of Iowa,
State of Montana,
State of Nebraska,
State of Texas,
State of Utah,
State of West Virginia,

      Plaintiffs,

          v.

Havas Media Group USA LLC,

      Defendant.

Case No.: 4:26-cv-804

**COMPLAINT**

**PRELIMINARY STATEMENT**

Plaintiffs, Federal Trade Commission ("FTC" or "the Commission"), by and through its

designated attorneys, and the States of Florida, Indiana, Iowa, Montana, Nebraska, Texas, Utah,

and West Virginia, by and through their respective Attorneys General (collectively, "the States")

(together with the Commission, "Plaintiffs"), petition this Court pursuant to Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton

Act, 15 U.S.C. § 26, to enter a permanent injunction and other equitable relief against Defendant

Havas Media Group USA LLC, to prevent anticompetitive conduct and unfair methods of

competition in or affecting commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §

1, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45 with co-conspirators, The

Interpublic Group of Companies, Inc., Omnicom Group Inc., Dentsu US, Inc., GroupM

Worldwide LLC (d/b/a WPP Media), and Publicis, Inc.

## I.    <u>NATURE OF THE CASE</u>

1.    Freedom of speech and the press are foundational to American liberty. Over the

last decade, untold numbers of Americans have been censored online and prevented from taking

part in critically important political and social debates. As both individuals' speech and

journalism increasingly moved online over the last decade, various digital gatekeepers exercised

far-reaching and often unchecked control over Americans' free expression.[1] The result was a

warped public discourse in which viewpoints disfavored by powerful corporations were excluded

from portions of the digital public square.[2]

2.     Much online censorship in recent years resulted from social media firms and

other digital platforms that suspended or banned users, algorithmically downranked news

articles, demonetized content creators, and imposed "warning labels" on online posts. But there

were parallel efforts by various interested parties to demonetize disfavored conservative news

and opinion sites by denying them digital advertising revenue.

3.    Over the past decade, a number of organizations pursued strategies that involved

classifying disfavored opinions as "misinformation" and then lobbying the digital ad-buying

---

[1] *See generally* U.S. House of Representatives, Interim Staff Report Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Censorship-Industrial Complex: How Top Biden White House Officials Coerced Big Tech to Censor Americans, True Information, and Critics of the Biden Administration* (May 1, 2024), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Biden-WH-Censorship-Report-final.pdf.

[2] *See, e.g.*, U.S. House of Representatives, Interim Staff Report Committee on the Judiciary, *GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech* (July 10, 2024) at 27-32, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-10%20GARMs%20Harm%20-%20How%20the%20Worlds%20Biggest%20Brands%20Seek%20to%20Control%20Online%20Speech.pdf.

ecosystem to demonetize sites that hosted or shared such content. Some of the most prominent groups included NewsGuard (a self-described ratings agency that ranks the reliability of media outlets),[3] the Global Disinformation Index ("GDI") (an activist group that seeks to partner with governments and private corporations to attack "disinformation"),[4] Check My Ads (a media watchdog that is "famous for publicly shaming ad-tech firms and advertisers who may have inadvertently funded disinformation and fake news"[5]), and Media Matters for America (an advocacy group which describes itself as a "progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media"[6]).

4.     These groups were relatively small, but they each, in their various ways, sought to elevate concerns within the digital advertising industry about what they viewed as "misinformation," in order to deprive certain sites of the digital ad revenue they needed to survive. For instance, NewsGuard expressly markets itself as a means to disrupt advertising revenue for "misinformation publishers" by licensing "exclusion lists of untrustworthy sites" to advertisers.[7] GDI was created because its founders believed that the results of the 2016 U.S. presidential election and Brexit referendum were caused by media disinformation, which could be solved by targeting the media companies' advertisers.[8] Check My Ads explained, in a 2022

---

[3] *About NewsGuard*, NEWSGUARD, https://www.newsguardtech.com/about-newsguard/.

[4] *Who We Are*, GLOBAL DISINFORMATION INDEX, https://www.disinformationindex.org/about.

[5] Ryan Barwick, *Disinformation and ad-tech activists Check My Ads are starting a nonprofit*, MARKETING BREW (Oct. 27, 2021), https://www.marketingbrew.com/stories/2021/10/27/misinformation-and-ad-tech-activists-check-my-ads-are-starting-a-nonprofit.

[6] *About Us*, MEDIA MATTERS, https://www.mediamatters.org/about-us.

[7] Matt Skibinski, *Special Report: Top brands are sending $2.6 billion to misinformation websites each year*, NEWSGUARD, https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report/.

[8] Virginia Kirst, *Global Disinformation Index: Cutting off the money supply to disinformation*, UPGRADE DEMOCRACY (Apr. 18, 2024), https://upgradedemocracy.de/en/perspective/highlights/global-disinformation-index-cutting-off-the-money-supply-to-disinformation/.

article titled "Here's our plan to defund the insurrectionists," that it was "launching the first effort to permanently block" prominent conservative media figures such as Charlie Kirk, Glenn Beck, and Steve Bannon "from the ad industry."[9] And Media Matters engaged in a related campaign to pressure advertisers to remove their advertising from Fox News due to its "extremist programming,"[10] as well as targeting Elon Musk's X.[11]

5.      It was in this social and political environment that, rather than compete independently, the nation's largest ad agencies—firms that buy digital ad inventory on behalf of their advertiser clients—agreed that they would all use the same "brand safety" standards to avoid buying ads on websites containing "misinformation." "Brand safety" refers to advertisers' desire to avoid buying ads on sites that are categorically inappropriate for any advertising support; for example, brands do not want their ads to appear on pornography websites or sites associated with criminal activity or terrorism. Brand-safety protections are important to advertisers.

6.      In a competitive market, the ad agencies would have faced strong economic incentives to capture business from their rivals by developing lower cost, higher quality, better targeted, and more innovative brand-safety tools—all to the benefit of their advertiser clients. Advertisers would also likely benefit from this competition by getting more value for their advertising budgets.

---

[9] *Here's our plan to defund the insurrectionists*, CHECK MY ADS (Jan. 5, 2022), https://checkmyads.org/?p=800.

[10] *Tell Advertisers: Drop Fox*, MEDIA MATTERS FOR AMERICA, https://action.mediamatters.org/secure/drop-fox; *see also* Bobby Lewis, *Fox & Friends is a ticking time bomb for advertisers*, MEDIA MATTERS FOR AMERICA (May 20, 2021), https://www.mediamatters.org/brian-kilmeade/fox-friends-ticking-time-bomb-advertisers.

[11] *Here are the companies pulling ads from X*, MEDIA MATTERS (Nov. 17, 2023), https://www.mediamatters.org/twitter/here-are-companies-pulling-ads-x.

7.      Instead of competing, however, the ad agencies agreed to adopt the same brand-safety standards on "misinformation." In 2018, the agencies established the Advertiser Protection Bureau ("APB") through their trade association, the American Association of Advertising Agencies (the "4As"). As one ad agency executive summarized the APB's genesis, "the major [ad agency] holding companies came together under the 4As and **agreed that brand safety is so important, that we must combine efforts, become one voice, and stop sending potential mixed signals**." The 4As vice president agreed, declaring, "**When it comes to brand and consumer safety, media agencies have to put competition aside.**"

8.      Later, the ad agencies also coordinated through the Global Alliance for Responsible Media ("GARM"), an entity created by the World Federation of Advertisers and which they each joined as members. One ad agency executive described GARM as a forum for agencies to "**check[] their competitive relationships at the door**" while they are "**engaged in the brand safety discussion**." In fact, GARM made clear to the six largest global advertising holding companies (the "Big Six") that discussions between the ad agencies about brand safety were governed by secrecy: "**The first rule of Fight Club is: You do not talk about Fight Club. The second rule of Fight Club is: *You do not talk about Fight Club.***" Elsewhere, GARM leadership itself also wanted "**the agencies [to] speak as a single entity to describe how they're tailoring plans and buys**." During a retrospective on GARM's third anniversary, the question was posed, "How has **collective work in brand safety** and suitability helped brands address tension points in media?" The answer was, "Lots of work done within the agencies historically and coming together to address these as peers in 4As APB – **collaborate not compete on safety which is why *uncommon collaboration* is so natural for us**."

9.      Both the APB and GARM established a common "Brand Safety Floor" to target "misinformation." The Brand Safety Floor resulted in reduced ad revenues for many conservative publishers; sites that fell below the Brand Safety Floor were at risk of being passed over as ad agencies looked to spend billions of dollars to buy ad inventory on behalf of their advertiser clients. Today, the largest ad agencies control over $81 billion of ad-buying power.

10.      The Sherman Act prohibits "every contract, combination . . . , or conspiracy, in restraint of trade." In other words, the antitrust laws prevent competitors from agreeing to act collectively in ways that harm competition. Here, as one GARM document explained, the agencies' agreement on a brand-safety standard related to "misinformation" allowed "the agencies [to] speak as a single entity." This agreement insulated the ad agencies from the competitive pressures that would otherwise have existed for them to improve and differentiate their brand-safety offerings with the goal of capturing business from each other. It harmed advertisers because they lost the benefits of that competition, including better quality and lower cost brand-safety tools, and the broader reach, better targeting, and cheaper inventory that those tools would have provided in the absence of the agencies' agreement. And, ultimately, by demonetizing certain conservative media outlets, the agreement hampered debate on some of the most consequential and hotly debated subjects of public life.

11.      Plaintiffs bring this action to restore competition between ad agencies on brand-safety standards, and to vindicate Americans' interest in a free and open public square unconstrained by unlawful ad agency collusion.

## II.    THE PARTIES

12.      Plaintiff Federal Trade Commission ("FTC") is an agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et*

*seq.*, with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility for enforcing, inter alia, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces. This case is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), because the FTC has reason to believe that the Defendant is violating, or is about to violate, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 1 of the Sherman Act, 15 U.S.C. § 1, making it appropriate, efficient, and suitable to file this action in federal court to seek the requested relief.

13.     Plaintiff State of Florida is a sovereign state of the United States. This action is brought by and through its Attorney General, James Uthmeier, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The State of Florida brings this action in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents, and to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1. The Office of the Attorney General for the State of Florida has its principal offices at The Capitol, PL-01, Tallahassee, FL 32399.

14.     Plaintiff State of Indiana is a sovereign state of the United States. This action is brought by and through its Attorney General, Theodore E. Rokita, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

15.     Plaintiff State of Iowa is a sovereign state of the United States. This action is brought by and through its Attorney General, Brenna Bird, who is the chief law enforcement

officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

16.    Plaintiff State of Montana is a sovereign state of the United States. This action is brought by and through its Attorney General, Austin Knudsen. Plaintiff State of Montana has reason to believe that the Defendant has engaged in the anticompetitive course of conduct set forth herein, which has caused adverse effects to consumers and harm to economic competition in trade and commerce in this State. Therefore, the Office of the Attorney General of the State of Montana believes and is of the opinion that this matter is in public interest.

17.    Plaintiff State of Nebraska is a sovereign state of the United States. Michael T. Hilgers is the Attorney General of Nebraska and authorized to bring legal actions on behalf of the State and its citizens.

18.    Plaintiff State of Texas is a sovereign state of the United States. This action is brought by and through its Attorney General, Ken Paxton. Plaintiff State of Texas has reason to believe that the Defendant has engaged in the anticompetitive course of conduct set forth herein, which has caused adverse effects to consumers and harm to economic competition in trade and commerce in this State. Therefore, the Antitrust Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that this matter is in public interest.

19.    Plaintiff State of Utah is a sovereign state of the United States. This action is brought by and through its Attorney General, Derek Brown, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

8

20.     Plaintiff State of West Virginia is a sovereign state of the United States and brings this action by and through its Attorney General, John B. McCuskey. Attorney General McCuskey is authorized to bring this action pursuant to 15 U.S.C.§ 26 to enjoin violations of federal antitrust laws.

21.     Defendant Havas Media Group USA LLC ("Havas") is a corporation organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware with its executive offices and principal place of business located at 200 Hudson Street, New York, NY 10013.

22.     Except to the extent that competition has been restrained as herein alleged, Defendant Havas and its co-conspirators, Dentsu, WPP, Omnicom, IPG, and Publicis, have been and are now in competition among themselves and with other advertising agency holding companies, to sell services to advertisers including Media Buying Services, which encompass the purchase of programmatic digital advertising inventory on behalf of or for resale to the advertisers.

23.     The Defendant is, and at all times relevant herein, has been engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and engages in business that is in or affects commerce, as "commerce" is defined in Section 4 of the FTC Act, as amended, 15 U.S.C. § 44.

### III.     **JURISDICTION AND VENUE**

24.     The FTC brings this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to prevent Defendant's violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 1 of the Sherman Act, 15 U.S.C. § 1. The States bring this action under their common law, equitable, or statutory powers, and under Section 16 of the Clayton Act, 15 U.S.C. § 26, as

*parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents, and to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 53(b).

26.    This Court has personal jurisdiction over Havas because Havas has the requisite constitutional contacts with the State of Texas.

27.    Venue is proper in this district under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district.

## IV.    <u>MARKET STRUCTURE</u>

### A.    **The Big Six and Media Buying Services**

28.    Until on or about November 26, 2025, there were six major global advertising holding companies: co-conspirators The Interpublic Group of Companies, Inc. ("IPG"), Omnicom Group Inc. ("Omnicom"), Dentsu US, Inc. ("Dentsu"), Publicis, Inc. ("Publicis"), and GroupM Worldwide LLC (d/b/a WPP Media) ("WPP"), and Defendant Havas Media Group USA LLC ("Havas") (collectively the "Big Six"). On or about November 26, 2025, Omnicom closed its acquisition of IPG.[12]

29.    Advertising agency holding companies are conglomerates of acquired independent agencies. The two primary services that advertising agencies provide are creative advertising (e.g., slogans, branding, visual designs, commercial) and media buying (e.g.,

---

[12] This Complaint nevertheless refers to the "Big Six" because, at most times relevant herein, IPG was a separate and independent Big Six advertising agency holding company. After Omnicom and IPG consummated their merger on or about November 26, 2025, there were and are now five major advertising agency holding companies.

preparing a media buying plan, and conducting negotiations or setting parameters for executing the plan).

30.    The market for Media Buying Services in the United States is characterized, in part, by the media buying agency's scale, in terms of geographic reach, clientele, the types of media on which the agency buys advertising, and the pool of advertising dollars to spend in media buying negotiations. For large advertisers seeking to reach customers in the United States, the Big Six possess the scale and experience that these advertisers commonly seek to aid their negotiations with media publishers. An advertiser often contracts with a single Big Six agency to handle its media buying needs in the United States.

31.    Collectively, as of 2023, the Big Six accounted for about $81 billion out of a total of $155 billion in U.S. media billings, or a 52% share.

32.    The Big Six often compete against each other to serve this distinct set of customers with global media buying needs and higher advertising budgets, trying to offer the best possible Media Buying Services.

**B.    Brand Safety and Brand Suitability**

33.    Part of this competition involves providing a strategy for excluding "unsafe" or "unsuitable" advertising inventory as a component of any media buying plan. As discussed above, "brand safety" can refer to preventing ads from appearing on websites or next to content that the brand or agency believes would damage the brand's reputation, such as illegal websites that perpetrate scams and other frauds or recruit for terrorist organizations. "Brand suitability" can refer to preventing ads from appearing on websites or next to content that would be inappropriate for that particular brand. For example, an airline might not want its ads to run on

webpages with news articles about a plane crash, whereas a clothing brand might be indifferent to advertising on such webpages.

34.     In setting the strategy for a media buying plan, advertisers and agencies must decide how to balance the ad campaign's reach or performance against "brand safety" and "brand suitability" while minimizing costs. As the Interactive Advertising Bureau ("IAB"), a trade association for digital advertisers, wrote in 2018, just before the onset of the conspiracy, "Advertising quality is in the eye of the beholder – some value brand safety more, some value viewability more, some simply focus on campaign performance." The IAB therefore recommended taking "a nuanced approach rather than blocking entire content categories or keywords."

35.     Before the onset of the conspiracy in 2018, the large advertising agencies did indeed take a more "nuanced approach." For example, in late 2017, co-conspirator Omnicom wrote that it established a "brand safety scorecard to plot each client's 'risk vs cost' audit."

36.     Over time, one standard method of implementing "brand safety" procedures has been to assemble lists of content categories and publishers from whom the media buying agency will or will not purchase inventory. These lists are typically called inclusion or exclusion lists, respectively, and may derive in part from third-party firms that assign ratings to news stories or publishers. Other tools that the media buying agency might use include those from measurement firms that can determine where a client's ads ran and how effective they were—overall and with respect to the client's "brand safety" strategy. These are the types of efforts that the advertising agencies made before they implemented their collusive and one-size-fits-all "floor" approach to news and political commentary under categories such as "Debated Sensitive Social Issues" and "Misinformation."

37.     The advertising industry generally recognizes that service providers should be competing against one another's "brand safety" strategies. For example, the IAB, in a May 2025 email recruiting attendees for a webinar aimed at advertising agencies and other industry players, pledged that it could help participants "turn brand safety into your competitive edge."

### C.    Digital and Programmatic Advertising

38.     Digital advertising is distinct from other forms of advertising because of its precision, adaptability, and interactivity. Digital ads offer detailed performance metrics including impressions, clicks, conversions, bounce rates, and more. Advertisers can track return on investment ("ROI") and adjust campaigns based on real-time data. Unlike static print or broadcast ads, users can click, swipe, or otherwise engage with digital ads. Digital ads can also be dynamically personalized based on user behavior, preferences, or location. Other advertising formats—such as print, radio, or outdoor advertising—do not offer these personalization, measurement, and engagement features.

39.     Programmatic advertising is a method of buying and selling digital ad inventory using automated technology including real-time bidding ("RTB"). Advertisers bid on individual ad slots, which are locations where digital ads can appear. When a user visits a website, an auction occurs in real time to determine, typically within milliseconds, which ad is shown. An ad "impression" occurs each time that a digital ad is served for display on a particular screen. Buyers such as brands and ad agencies often agree to pay a certain cost per mille ("CPM"), meaning price per thousand ad impressions. Advertisers have numerous options for setting the parameters of an ad campaign, including what types of publishers to include in or exclude from the campaign, and which types of users to target based on factors such as demographics, device type, location, and how much the advertiser is willing to pay for impressions and click-throughs.

40.    Direct digital advertising entails manual negotiations between specific buyers and sellers for digital ad inventory. This process is slower and costlier, for both advertisers and publishers, than using RTB platforms to buy and sell digital ads programmatically.

41.    Beyond identifying and targeting the right demographic of consumers, advertisers must also consider geographic factors—such as language, cultural preferences, and legal compliance requirements like the General Data Protection Regulation ("GDPR") in Europe—that limit cross-border substitutability.

## V.    THE RELEVANT MARKET

42.    The relevant line of commerce in which to analyze the anticompetitive conduct is no broader than the provision of "Media Buying Services." The Big Six account for 52% of U.S. media billings in that market. There may also be a distinct submarket of Media Buying Services for a distinct subset of customers with high advertising budgets that require cross-market, multi-channel advertising campaigns. The largest six—now five—advertising agency holding companies dominate this submarket. The programmatic purchase of digital advertising inventory on behalf of large advertising brands may also form a relevant submarket for advertising agencies providing Media Buying Services. The Big Six ad agencies have market power in the Media Buying Services market and all of the above-mentioned submarkets.

43.    The relevant geographic market is the United States. The advertisers may come from every corner of the globe and the Big Six advertising agency holding companies have extensive international presence. Advertisers use the Big Six for Media Buying Services to target advertising at individuals within the United States.

## VI.     ANTICOMPETITIVE CONDUCT

44.     The Big Six colluded with each other, and through organizations established under the auspices of two major trade associations in the advertising industry, on "brand safety" dimensions of their sale of Media Buying Services.

### A.     Big Six Membership in Advertiser Protection Bureau ("APB")

45.     The American Association of Advertising Agencies, also known as the "4As," is a trade association that represents the interests of advertising agencies.

46.     In April 2018, the Big Six formed the APB within the 4As to "create an industry collective with responsibility of achieving 'Advertising Assurance,' to enforce environments where brands and consumers can coexist with trust." In other words, "the major holding companies came together [in 2018] under the 4As and agreed that brand safety is so important, that we must combine efforts, become one voice, and stop sending potential mixed signals" regarding "brand safety" to platforms and publishers.

47.     From the start, the APB made clear that its member agencies would reduce the extent to which they compete when it came to "brand safety" strategies. As a 4As vice president publicly stated when the APB was founded, **"When it comes to brand and consumer safety, media agencies have to put competition aside."**

48.     The APB's membership is comprised almost exclusively of the Big Six advertising agency holding companies. During the course of the events described in this Complaint, the APB met weekly or more often.

15

B.     The "Brand Safety Floor" and "Brand Suitability Framework"

49.     The initial forum where the Big Six cooperated and agreed with each other on "brand safety" standards and practices—including with respect to "Debated Sensitive Social Issues" and, later, "Misinformation"—was the APB.

50.     In September 2018, pursuant to this cooperation, the APB promulgated the "Brand Safety Floor" and the "Brand Suitability Framework." The Floor and Framework consisted of content categories, such as "Online Piracy" and "Spam or Harmful Content," with the Floor describing types of content within each category that were "not appropriate for any advertising support" by ad agencies and other industry players.

51.     The Brand Suitability Framework, using the same categories, assigned risk levels of "low," "medium," and "high" to different descriptions of content within each category, but left it to advertisers to decide what level of risk was acceptable for their respective brands.

52.     In announcing the Brand Safety Floor and Brand Suitability Framework, the APB explained that the endeavor sought to "mov[e] brand safety discussions to a more granular content level."

53.     The Big Six made no secret of what they intended to achieve by agreeing at this "granular" level. The APB Brand Safety Floor and Brand Suitability Framework announcement quoted the Managing Partner of Brand Safety for the Americas at GroupM (WPP) as declaring: "The foundation of Brand Safety must be built on a concrete, universal understanding of content that is never appropriate under any circumstances." The same announcement also quoted the Executive Vice President of Digital Investment & Standards at Publicis Media Exchange, who asserted: "The APB has been instrumental in taking steps to create a common understanding

16

around the issue, and in providing the necessary framework to cultivate a safe space for industry-wide collaboration" to create "consistent parameters and policies across all partners."

54.     However, the Big Six recognized the limitations on the APB's ability to enforce its agreed-to standards in the industry. As one APB participant from GroupM (WPP) noted in July 2019, APB "addresses the symptoms of the problem not the cause," much like "a police force, but with no laws to apply."

55.     The solution, the Big Six realized, was to partner with the World Federation of Advertisers' ("WFA") Global Alliance for Responsible Media ("GARM") initiative. The WFA is a trade association that represents the interests of advertisers—i.e., purchasers of advertising inventory—as opposed to the advertising *agencies* who are represented by the 4As. The WFA established GARM in June 2019. Each of the Big Six was a founding member of GARM and maintained its membership until GARM's dissolution in August 2024. GroupM (WPP) was a member of the GARM Steer Team, which acted like a board of directors and plotted the overall direction of the initiative. Unlike the core of the WFA's operations, GARM was, by design, open to companies other than those who purchase advertising.

56.     GARM and the APB formally partnered in July 2019, with a 4As representative declaring that they were "looking to build upon & share the work already begun with the [APB]." Or, as the 4As' CEO explained, "there were no global protocols but the 4A's APB created the floor and framework that the GARM framework was built upon and refined."[13]

---

[13] On July 31, 2020, the GARM Initiative Lead sent dozens of contacts—including several of the Big Six—a presentation on brand safety, dated July 29, 2020. That presentation explained that creation of the Safety Floor and Suitability Framework "has been driven by the 4A's APB working group," and that "[w]ithin the GARM we are agreeing to implement this . . . ."

17

57.     As Big Six executives understood, enforcing the Brand Safety Floor would require ongoing coordination between the agencies. According to language that a Publicis executive drafted in July 2019, each agency would "identify bad actors across [the] ecosystem through the APB," which would be "made up of global brand safety leads from each [agency] holdco [holding company] that alert the other 'APB' cross-holdco agency members of any sudden known or potential violative content to avoid and blacklist." After the Publicis executive emailed this proposed language to a GroupM (WPP) executive, he in turn emailed it to the GARM leader.

58.     The Big Six used GARM as a mechanism to push the joint standards, originally developed by APB, throughout the advertising ecosystem. "This is exactly what GARM is here to address," the GroupM (WPP) executive stated, "and when the platforms have agreed to new rules of engagement, it will accelerate the [APB's] work."

59.     That early tight connection between the organizations was also reflected, for example, in an October 2019 email from the CEO of the 4As to the GARM Initiative Lead to thank him for recognizing the contributions of a consultant who "on behalf of the 4A's and the APB" was working "for agencies to lead this change." The 4As' CEO offered to cover the consultant's fees for him to continue representing the 4As. The GARM leader replied that the consultant would be included in GARM "Steer Team meetings + decision making."

60.     In November 2019, the APB approached GARM with a list of "brand safety imperatives" that the APB wanted to "tackle . . . in partnership with GARM," including key "Agency asks for platforms." The framing of "Agency asks" made clear that the agencies had reached agreement with one another. The APB's list—called the "Agency Pledge of Advertising Assurance"—included various requirements for "Monetization Guidelines/Content." One of

these APB requirements was that GARM demand that platforms and publishers commit to "[a]bsolute protection from content that would fall into the Brand Safety Floor."

61.    GARM agreed, with the 4As later boasting that GARM "adapted and evolved" APB's work in this area "into a global approach."

62.    Big Six executives also understood that "brand safety" standards and practices constituted a competitively sensitive area in which to differentiate their services from other Big Six agencies, as a late 2019 internal email exchange among executives at Publicis made clear. Publicis "got a taskforce together . . . and put together a plan on content & timing" to produce a "Brand Safety Guidebook" precisely because WPP had published its own. But one of the executives declared that Publicis would create its Brand Safety Guidebook with "a lot more action" than the one published by WPP. She further recommended, with emphasis, "**only distribut[ing] this internally and for clients**," not putting it "publically on our website as GroupM [WPP] did."

63.    In February 2020, a GroupM (WPP) executive wrote that GARM was a forum for agencies to "check[] their competitive relationships at the door (GroupM vs Publicis . . .)" while they are "engaged in the brand safety discussion."

64.    In particular, the Big Six regularly met with one another under the auspices of the "Advancing Shared Language" working group within GARM. The goals of this working group were, among other things, to "deploy an enhanced version of the APB Brand Safety + Suitability Framework" and "address News + Journalism."

65.    In a June 2020 report, WPP acknowledged that there was tension between abiding by the Brand Safety Floor and delivering what clients wanted. The Brand Safety Floor won. "While it is right for the industry to focus on the risk-based approach and enable advertisers to

19

choose the environments that are more or less suitable to their brand, we ought not to forget that contextual brand safety, defined by 4A's Brand Safety Floor, continues to exist . . . [and] must continue to be observed, avoided and acted on."

66.     The initial GARM version of the Brand Safety Floor and Brand Suitability Framework, released in September 2020, hewed closely to the categories and descriptions in the APB version, including the category of "Debated Sensitive Social Issues."

**C.     The Big Six Agree to a New Category for the Brand Safety Floor: "Misinformation"**

67.     Early versions of the Brand Safety Floor required adherents to demonetize advertising inventory on content that constituted "[i]nsensitive, irresponsible and harmful treatment of debated social issues and related acts that demean a particular group or incite greater conflict," but the Big Six and GARM decided this approach was not enough.

68.     In June 2020, GARM's Initiative Lead informed other GARM leaders, including GroupM (WPP) and the 4As (APB), that the first step in a plan for "[n]avigating news in a polarized media marketplace" is to "[e]liminate disinformation via exclusion lists." The GroupM (WPP) executive responded: "Count me in!"

69.     By the beginning of July 2020, the APB circulated to GARM members a deck that explained proposed modifications to the Brand Safety Floor and Brand Suitability Framework. These "expansions of our Floor and High Risk definitions" sought to prevent or deter the purchase of advertising inventory from online publishers with disfavored viewpoints on issues such as "ProLife/ProChoice, Gun Control, Privacy vs Public safety, Capital Punishment, Immigration reform, Universal healthcare, [and the] Green New Deal."

70.     At the same time, GroupM (WPP) was teeing up a discussion for the Big Six (via the APB and including the GARM Initiative Lead) to add "Misinformation" as a new category in

20

the "4A's/GARM Brand Safety Floor & Framework." The process followed the same approval path as the original APB Brand Safety Floor and Brand Suitability Framework, with the APB members (largely made up of the Big Six) first approving the recommendation among themselves, then forwarding the recommendation to the GARM Steering Committee for further approval.

71.     On July 2, 2020, a GroupM (WPP) executive, on behalf of the APB, reported to the GARM Initiative Lead "that the category of Misinformation is complicated and important" but that they would "prefer to table Misinformation for now, with a commitment to tackle the definition working with GARM moving forward." On July 15, 2020, the GARM Initiative Lead reached out again to the Big Six and 4As. A Publicis executive wrote back minutes later to convey that the Big Six "met yesterday on misinformation and had a ton of back and forth discussion. We're close, but not 100% there." The GARM leader replied: "Awesome to hear."

72.     In September 2020, in furtherance of the conspiracy, Defendant Havas and co-conspirators Dentsu, GroupM (WPP), Publicis, and Omnicom agreed "to explore expanded guidance to foster commonality in categorization of individual pieces of content."

73.     By October 2020, with respect to "Harmful Content Definitions," a GARM deck noted that "[w]e've gained alignment on definitions across platforms, agencies, and marketers" and a plan to "[drive] more consistent + predictable implementation via 3rd parties with increased content category specification."

74.     A June 2021 GARM document referring expressly to the participation of at least three of the Big Six agencies made an unambiguous "REQUEST": "[E]nsure that the articles of misinformation and disinformation are removed from monetized content and media plans." GARM's plan was to "[g]ain endorsement and application across the industry by Jul 22."

21

75.    In October 2021, the GARM Initiative Lead emailed the Big Six, the 4As, and select other leaders in the advertising industry to explain: "Requirements are clear from large scale advertising players (Madison Avenue)"—a reference to the big advertising agencies—but "it needs more than 'boycotts' or 'pauses'" for the Big Six to get what they want. Understanding, however, that this coordination could be problematic for those involved, he cautioned everyone including the Big Six: "**The first rule of Fight Club is: You do not talk about Fight Club. The second rule of Fight Club is:** *You do not talk about Fight Club.*" An IPG executive responded to the full group that they all "need to huddle and work out what the advertising industry wants."

76.    In February and March 2022, GARM leadership organized meetings and email exchanges for "the agencies [to] speak as a single entity to describe how they're tailoring plans and buys." NewsGuard featured prominently in the discussion. IPG told its rivals: "We're leveraging NewsGuard to avoid . . . anything that scores red (fail) on being a reputable/quality news source." WPP's GroupM also responded to tell its competitors about its plans regarding placing advertisements for its clients. And in the same instance, Publicis told its rivals that it was "[h]appy to participate and share action steps." In so doing, Publicis told other large advertising agencies that it will advise clients to "[c]onsider trusted news sources as areas to help eliminate funding for misinformation: . . . NewsGuard helps identify and exclude misinformation sites & apps and can be activated through [Publicis'] global exclusion list. . . . This is a time to remind advertisers and agency teams of established industry standards like GARM."

77.    A June 2022 GARM document setting forth topics and questions for a panel on "GARM [at] 3Y[ears old]" included the following question specifically for GroupM (WPP): "How has collective work in brand safety and suitability helped brands address tension points in

media?" The answer: "Lots of work done within the agencies historically and coming together to address these as peers in 4As APB – collaborate not compete on safety which is why *uncommon collaboration* is so natural for us."

78.    As GARM admitted, "2021 was about… [a]greeing to act on Misinformation," and by facilitating this sustained "uncommon collaboration" between competitors, GARM was finally ready in June 2022 to add "Misinformation" as a new category of the Brand Safety Floor.

79.    GARM did not stop at promulgating neutral rules; it put its hand on the scale. In November 2021, the GARM Initiative Lead had suggested including "willfully misleading" content in the "misinformation" category to ensure that advertising revenue would be denied to the conservative website *Breitbart* specifically. The GARM leader explained to an executive from GroupM (WPP): "The example of how Breitbart may use facts selectively to mislead was an example given" of the need to amend GARM's working definition of "misinformation." Ultimately, GARM implemented the Initiative Lead's suggestion. Contemporaneously with GARM's formulation and implementation of this additional Brand Safety Floor category, conservative publishers identified as publishing what the Brand Safety Floor defined as "misinformation" suffered dramatic declines in their sales of digital advertising inventory.

80.    GARM took a victory lap after implementing this expansion of the Brand Safety Floor. A GARM slide deck prepared for its November 2022 "bootcamp"—which GARM's Initiative Lead praised as "fantastic"—highlighted "Uncommon Collaboration" among entities including the 4As, IPG, and Publicis. Attendees at the related "Masterclass" included the 4As, Dentsu, UM (IPG), Publicis, and GroupM (WPP).

23

**D.      GARM Dissolved in August 2024, but the Conspiracy Could Easily Recur**

81.      Beginning in 2023 the U.S. House Judiciary Committee began investigating GARM, NewsGuard, GDI, and related organizations, including for potential violations of the antitrust laws. On July 10, 2024, the Committee issued an interim staff report entitled "GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech." The report was based on document productions from and interviews of GARM and the other entities investigated. The report concluded that "[t]he information uncovered to date of WFA and GARM's collusive conduct to demonetize disfavored content is alarming." And it noted that "[t]he extent to which GARM has organized its trade association and coordinates actions that rob consumers of choices is likely illegal under the antitrust laws and threatens fundamental American freedoms."

82.      GARM dissolved shortly thereafter, on August 9, 2024, citing the "recent allegations." The 4As and the APB remain active to the present day, and the Defendant and co-conspirators remain members.

83.      Four days after GARM dissolved, GroupM (WPP) sent a memorandum regarding its "Brand Safety Policy" to a series of business partners. The memorandum explains that GroupM (WPP) will continue to abide by the GARM standards despite GARM's dissolution.

84.      After the disbandment of GARM, Dentsu joined a research effort spearheaded by the 614 Group (a research and consulting firm) that was publicly characterized as an effort to continue the work of GARM. After additional scrutiny by the House Judiciary Committee, Dentsu withdrew from the initiative.

85.      In an October 17, 2024 email a high-ranking executive at a major trade association wrote: "Heard we are planning to discuss GARM as a hot topic. . . . I would not discuss what happens next as we are still discussing that with [another trade association] and

24

4A's . . . . We have agreed to wait until the dust settles after the election to see where the political chips fall….we are regrouping at the end of November [2024]."

86.    These actions—and the conversations taking place between members of the trade associations—in the months following GARM's dissolution and leading up to the presidential election, demonstrate an ability and willingness to reengage in this anticompetitive conspiracy depending on "where the political chips fall" in the future.

## VII.    ANTICOMPETITIVE EFFECTS

87.    The Big Six agreement to establish a common Brand Safety Floor for the digital advertising industry stifled competition on brand-safety standards and practices to the detriment of the American public at large. It excluded available advertising inventory, was not in the ad agencies' respective individual economic self-interest, reduced the quality of Media Buying Services to their clients, undermined the freedom of speech, and degraded media options for American consumers.

88.    The Supreme Court has explained that the "Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. . . . The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability— and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers."[14] The Court has further held that advancing a perceived social goal is not an excuse for competitors to collude instead of compete.[15] Likewise, a "refusal to compete with

---

[14] *Nat'l Soc'y of Prof'l Engr's v. United States*, 435 U.S. 679, 695 (1978).
[15] *Id.* at 695-96.

respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement," violates the Sherman Act.[16]

89.    Prior to their collusive agreement, the Big Six "agencies had separate views and vocabulary on harmful content."

90.    Absent their agreement in restraint of trade, each of the Big Six would have developed—independently and in competition with each other—differentiated standards and practices for clients to use in refining their own inclusion and exclusion criteria when buying advertising inventory that balanced safety, performance, and cost in different ways. The Big Six were in fact naturally inclined to compete in this fashion. This tendency was reflected, for example, in the reaction of Publicis to WPP's initial publication of a Brand Safety Guidebook.[17]

91.    The Big Six agreed to set a Brand Safety Floor that, in part, demonetized advertising inventory appearing on lawful but disfavored content, including from news and political commentary publishers. This agreement eliminated an important opportunity for each of the Big Six to differentiate their services from those their competitors offered, and reduced the advertising inventory available to their clients. The Big Six reached, refined, and sought to implement this anticompetitive agreement under the auspices of the APB and GARM.

92.    Moreover, but for the conspiracy, it would not have been in the economic self-interest of each Big Six advertising agency to adopt identical standards and practices for the exclusion of advertising inventory from certain news and political commentary publishers. For example, in 2021, the CEO of the 4As wrote, regarding advertisers, that "you narrow your

---

[16] *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986).
[17] *See id.* at 452 ("[A]bsent such a restraint, competition among dentists for patients would have tended to lead dentists to compete with respect to their policies in dealing with patients' insurers . . . ."); *id.* at 465-66 (concluding that the FTC's rationale was supported by substantial evidence).

inventory and you're narrowing your REACH and you're hurting publishers and journalists." By agreeing on "brand safety" standards and practices for "Debated Sensitive Social Issues" and "Misinformation," advertising agencies were reducing available advertising inventory and thereby narrowing the reach of their clients' ad campaigns. Likewise, in 2022, in preparing for a panel conversation related to GARM, a Dentsu executive was slated to discuss the following question: "How do you see brands managing the relationship between doing the right thing and profit or business results?" That "doing the right thing" for GARM necessarily would require brands to "manag[e] the relationship" with "profit or business results" reflects the value the Big Six derived from their agreement not to compete on the Brand Safety Floor. In short, each member of the Big Six could rest assured that its competitors would impose the same tradeoffs on their respective customers. By agreeing to a common Brand Safety framework, the Big Six conveyed to themselves economic advantage by avoiding resource-intensive individual research and negotiations without fear of competitive disadvantage.

93.    Any business changes that any of the Big Six made in response to criticism of their "brand safety" standards and practices, including through programmatic filters and exclusion lists, could be reversed in the future absent binding remedies.

## VIII.    VIOLATIONS CHARGED

### Count 1 – Illegal Agreement in Violation of
### Section 1 of the Sherman Act and Section 5 of the FTC Act

94.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-93 above.

95.    Defendant and its co-conspirators reached an agreement to set a Brand Safety Floor that demonetized advertising inventory on lawful but disfavored content. This agreement

27

eliminated an important opportunity to differentiate their services from those their competitors offered and reduced the advertising inventory available to their clients. Defendant reached, refined, and sought to implement this anticompetitive agreement under the auspices of the APB and GARM. This agreement is a contract, combination, or conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

96.    Defendant's and its co-conspirators' agreement to restrain competition is unlawful.

97.    At all times relevant to the anticompetitive conduct alleged in this Complaint, Defendant and its co-conspirators had, and continue to have, market power in all relevant markets.

98.    Defendant's and its co-conspirators' agreement to restrain competition has had and will continue to have anticompetitive effects, including reducing customer choice by depriving their customers of the option to purchase advertising inventory from publishers with disfavored viewpoints.

99.    There are no valid procompetitive justifications for Defendant's and its co-conspirators' collusive conduct. To the extent that there are any valid procompetitive benefits to their conduct, such benefits are outweighed by their anticompetitive effects and could have been achieved without the anticompetitive restraint of trade.

100.    In the absence of binding relief, Defendant and its co-conspirators would be able and likely to reconstitute their anticompetitive agreement depending on where "the political chips fall." Defendant continues to meet in the APB, and ad inventory exclusion, under the auspices of "brand safety," which, although "not a topic of focus in the [4As'] *current* planning priorities . . . might become a focus at the Association [again] in the future if the advertisers who

28

are clients of Association member agencies indicate they want increased focus on brand safety from their agencies," according to a February 2026 letter from the 4As (emphasis added).

101.    Defendant's and its co-conspirators' unlawful agreement violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

### Count 2 – Unfair Method of Competition

102.    The FTC re-alleges and incorporates by reference the allegations contained in paragraphs 1-93 above.

103.    The agreement is an unfair method of competition that violates Section 5 of the FTC Act, 15 U.S.C. § 45.

104.    The agreement constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### IX.    POWER TO GRANT RELIEF

105.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act and, in the exercise of its equitable jurisdiction, to order equitable relief to remedy the injury caused by the Defendant's violations. Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes this Court to issue a permanent injunction for violations of the Sherman Act.

### X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and by Section 16 of the Clayton Act, 15 U.S.C. § 26, and pursuant to its own equitable powers, enter final judgment against Havas declaring, ordering, and adjudging:

A.     that Havas's course of conduct, as alleged herein, violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

B.     that Havas is permanently enjoined from engaging in its unlawful conduct;

C.     that Havas is permanently enjoined from engaging in similar and related conduct, or any conduct that is similar in purpose or effect; and

D.     any additional relief that the Court finds just and proper.

Dated: June 30, 2026                    Respectfully submitted,

                                        /s/ Justin Epner
                                        JUSTIN EPNER
Of Counsel:                             Bar Number: DC Bar # 1028431
                                        Ph: (202) 326-2942; jepner@ftc.gov
DANIEL GUARNERA                         NICHOLAS BUSH
Director                                Bar Number: DC Bar # 1011001
                                        Ph: (202) 326-2848; nbush@ftc.gov
KELSE MOEN                              CASSANDRA EHLY
Deputy Director                         Bar Number: DC Bar # 90034416
                                        Ph: (202) 326-2975; cehly@ftc.gov
Federal Trade Commission                LINCOLN MAYER
Bureau of Competition                   Bar Number: DC Bar # 992050
                                        Ph: (202) 326-3324; lmayer@ftc.gov
                                        THEODORE ZANG
                                        Bar Number: NY Bar # 2186518
                                        Ph: (212) 607-2816; tzang@ftc.gov

                                        Attorneys
                                        Federal Trade Commission
                                        600 Pennsylvania Avenue, N.W.
                                        Washington, DC 20580
                                        Telephone: (202) 326-2942

                                        PATRICIA GALVAN
                                        Assistant Director

                                        Technology Enforcement Division, Bureau of
                                        Competition

                                         /s/ Anne LeJeune
                                        ANNE LEJEUNE
                                        Texas Bar No. 24054286
                                        (Local Counsel)
                                        Ph: (214) 979-9371; alejeune@ftc.gov
                                        Federal Trade Commission
                                        1999 Bryan Street, Suite 2150
                                        Dallas, Texas 75201
                                        Facsimile: (214) 953-3079

                                        *Attorneys for Plaintiff Federal Trade Commission*

FOR PLAINTIFF STATE OF FLORIDA:

JAMES UTHMEIER
Attorney General, State of Florida

JASON HILBORN
Deputy Attorney General for Civil Enforcement

*/s/ Colin Fraser*
Colin Fraser
Senior Assistant Attorney General
Florida Bar No. 104741

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
Attorney No. 18857-49

/s/ *Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6309
Email: Scott.Barnhart@atg.in.gov

/s/ *Jesse Moore*
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

33

FOR PLAINTIFF STATE OF IOWA:

BRENNA BIRD
Attorney General, State of Iowa

*/s/ Daniel L. Barnes*
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection

Office of Iowa Attorney General Brenna Bird
1305 E. Walnut St. Des Moines, Iowa 50319
Tel.: (515) 281-8772
Email: daniel.barnes@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

34

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Brent Mead*
Brent Mead (MT #68035000)
*Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
(406)444-2026
brent.mead2@mt.gov

*Counsel for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEBRASKA:

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Cody S. Barnett
Cody S. Barnett
Solicitor General

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Email: cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
thomas.york@oag.texas.gov
amber.fly@oag.texas.gov
kay.dannenmaier@oag.texas.gov

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

/s/ *Katherine S. Dannenmaier*
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

AMBER L. FLY
Assistant Attorney General,
Antitrust Division
Texas State Bar No. 24101761

*Counsel for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF UTAH:

DEREK BROWN
Attorney General of Utah

*/s/ Marie W.L. Martin*
Douglas Crapo (14620)
Deputy Attorney General
Marie W.L. Martin (18712)
Division Director
160 E. 300 S., 5th Floor
PO Box 140830
Salt Lake City, UT 84114
(801) 366-0310
dcrapo@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

FOR PLAINTIFF STATE OF WEST VIRGINIA:

JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Douglas L. Davis*
Douglas L. Davis
Senior Assistant Attorney General
West Virginia Attorney General's Office
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax:     (304) 558-0184
douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

39